IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
February 14, 2006 Session

## STATE OF TENNESSEE v. JOEL MARSHALL JONES

**Direct Appeal from the Circuit Court for Marshall County**
**Nos. 16108, 16109    Lee Russell, Judge**

---

**No. M2005-00619-CCA-R3-CD - Filed April 21, 2006**

---

The Defendant, Joel Marshall Jones was convicted of aggravated burglary, theft of property valued at less than $500.00 and of theft of property valued at more than $1000.00.  The Defendant was sentenced to prison for fifteen years as a Range II offender. On appeal, the Defendant contends that: (1) the evidence is insufficient to sustain his convictions; (2) the trial court erred when it did not allow a witness to testify; and (3) the trial court erred when it extended the hours of the trial.  Finding no reversible error, we affirm the judgments of the trial court.


**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., J., joined.  GARY R. WADE, P.J., filed a dissenting opinion.

Fannie J. Harris, Nashville, Tennessee, for the appellant, Joel Marshall Jones, III.

Paul G. Summers, Attorney General and Reporter; Elizabeth B. Marney, Assistant Attorney General; W. Michael McCown, District Attorney General; and Michael D. Randles, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**
**I. Background**

In case number 16108, a Marshall County grand jury indicted the Defendant for one count of aggravated burglary of the habitation of Terry Moore, and two counts of theft of property belonging to Moore and valued at less than $500.00.  In case number 16109, the Defendant was indicted for two counts of theft of property owned by CSX Transportation Inc. and valued at more than $1000.00 but less than $10,000.00.  The indictments were consolidated for trial and were tried jointly with identical charges against Michelle Lee Hooten (Jones), a co-defendant.  A Marshall County jury convicted the Defendant of aggravated burglary and theft of property valued at less than $500.00 in case number 16108, and of theft of property valued at more than $1000.00 in case number

16109. The trial court issued an effective sentence of fifteen years in prison.

## II. Facts

This case arises from the Defendant's convictions of burglary and theft. Phillip Mitchell, an assistant foreman with CSX Transportation, testified that CSX Transportation has a facility in Lewisburg where various supplies and raw materials are kept in the supply yard. He explained that, on the day of the alleged crime, he and other CSX employees loaded a CSX truck with inventory from the CSX supply yard. He said that, after they loaded the truck, approximately eight to ten pairs of "compromise joint bars" remained in the supply yard. Mitchell testified that they left the supply yard, and, when they returned, they saw a blue pick-up truck with a woman in the driver's seat and a man outside the truck. He testified that the man appeared to be in a hurry to get into the truck. Mitchell explained that he got close to the blue pick-up truck and was able to peer into the bed of the pick-up truck where he saw five to seven compromise joint bars lying in the truck's bed. He explained that, as they pulled up beside this pick-up truck, the truck, which was already moving, did not slow down. Instead, the truck "took off" and left the premises. He said that he tried to see the truck's license tag number, but the truck was moving too quickly. Mitchell said that the eight to ten pairs of compromise joint bars that they had left in the supply yard were missing. He testified that he called the police and provided them with a description of the driver of the blue pick-up truck and the man who accompanied her.

On cross-examination, Mitchell testified that he did not have a list of the materials kept in the supply yard, and the stack of joint bars was located next to a pile of trash, which was four to five hundred feet away from the CSX buildings. He admitted that he did not know from which pile the Defendant took the bars. He explained that a contractor collects and resells the materials from the trash pile.

On redirect examination, Mitchell explained that the joint bars were in a stacked pile. He testified that the pick-up truck sped away, and, afterwards, he noticed that there were no longer any remaining pairs of compromise joint bars in the supply yard. He explained that non-CSX employees are not allowed to come onto CSX property and to take what they want from the pile of trash. He further explained that the property contains signs indicating that the area belongs to CSX and that trespassing is not permitted.

Cam Harmon testified that he has a business located in Cornersville, Tennessee that buys and sells scrap metal. He testified that, on the day of the alleged crime, he purchased more than one load of railroad steel from the Defendant. Harmon looked at tickets made to record the purchase of the steel and said that the tickets identified the Defendant as the seller of the steel. He testified that Detective Kevin Patin and some CSX employees came to his place of business and identified the steel that Harmon had purchased from the Defendant as steel that belonged to the CSX corporation.

On cross-examination, Harmon testified that the Defendant came to his business two to three

times a week and sold items such as old stoves and refrigerators. He identified a receipt that he had given to the Defendant that identified the material as short steel. He further testified that he does not do any commercial business with CSX and that CSX sells most of their materials to Boone Express. He recalled that the metal that the Defendant sold to him was rusty.

Dwight Emerson, an engineering supervisor at CSX, testified that compromise joint bars are unique to CSX. He explained that CSX compromise joint bars are identifiable because the bars have the numbers 136 and 132 stamped on them. He testified that compromise joint bars are reusable even if they are rusty. Emerson testified that he went to the scrap metal facility in Cornersville, Tennessee with Detective Patin and other CSX employees where he saw three to five CSX compromise joint bars with the numbers 132 and 136 stamped on them. He said that these CSX compromise joint bars were made from new material and that he did not see any bars that were made with scrap material.

B.K. Malhotra, a manager of material at CSX, testified that, during the time that the crime was committed, CSX paid $142.25 per compromise joint bar. On cross-examination, he admitted that he did not know how many compromise joint bars were at the facility on the day of the crime. He explained that he had to arrange for a special order purchasing compromise joint bars after he received a call from the road master at CSX informing him that the compromise joint bars were missing.

Gregory Primm testified that, on the day of the crime, he was visiting his wife's trailer and he saw the Defendant's pick-up truck pull in front of Terry Moore's trailer. He testified that his brother-in-law, Terry Moore, lived in the trailer in front of his wife's trailer. He said that he saw a man and a woman get out of the pick-up truck and go inside Terry Moore's trailer, and he could see the woman remain in the living room. The man left the living room and returned and gave the woman something that looked like a little grocery bag, and she exited the trailer and got in the truck. He said that the man continued to walk through all of the rooms in Terry Moore's trailer, and then went outside and put something in the back of the truck. Primm said that the man walked down the road, picked up a "For Rent" sign that was lying down in front of a trailer that was further down the road, drove the sign back into the ground, and then returned to the truck. Primm said that his wife returned, he told her what had happened, and they both talked to Moore. Primm told Moore about the people who had been in Moore's trailer, and they called the police. He explained that he provided the police with a description of the pick-up truck and the people that he had seen enter Moore's trailer. He received a call from the police asking him to come and identify the perpetrators of the crime. He went to the location specified by the police and identified the people that they found as the perpetrators of the crime.

Terry Moore testified that he lives in a trailer in front of his sister. He reported that, on the day of the crime, he returned home and his brother-in-law told him what had happened in his trailer. He explained that a little headphone radio, a bag of chicken, and two fish were missing from his trailer and that these items were inside his trailer when he left for work in the morning. Moore further testified that he locked the door to his trailer and that he did not give the Defendant

permission to go inside his trailer. He also said that he did not leave any trash on his front porch. On cross-examination, Moore admitted that, on the day of the crime, his trailer did not have any electricity or running water. He also acknowledged that a "For Rent" sign remained in the trailer's window and that he rented the trailer from Pat Smith.

Rebecca Mitchell, a patrol-woman with the Lewisburg Police Department, testified that, on the day of the crime, she responded to a dispatch call and went to Moore's trailer. She explained that Primm told her what he had seen occur in Terry Moore's trailer on the day of the crime. She testified that Primm provided her with a description of the Defendant, the woman that he was with, and the vehicle that they drove. She relayed this information to the rest of her shift, and later Officer Curley informed her to go to Park Avenue where a vehicle that fit the description was located. Mitchell testified that she went to this location, searched the vehicle, and found a walkman with a radio headphone, two fish, and two packages of chicken breasts.

David Curley, a patrolman with the Lewisburg Police Department, testified that, on the day of the crime, he received two "be on the lookout" advisories and found a truck that matched the descriptions provided parked in a driveway on Park Avenue. He said that he saw four people, including the Defendant, sitting on the apartment's front porch. He pulled his patrol car behind the truck in the driveway and found the Defendant and Hooten, the woman who accompanied the Defendant. Hooten and the Defendant provided him with their identification cards and other police officers arrived at the scene. He testified that Primm arrived at the scene and identified the Defendant and Hooten as the individuals who were inside Terry Moore's trailer.

Detective Kevin Patin, with the Lewisburg Police Department, testified that Terry Moore identified pictures of items that were taken from the Defendant's truck as his possessions. He further testified that he observed the compromise joint bars at Harmon's scrap yard and acknowledged that CSX employees identified the joint bars as CSX property. He described how he transported the Defendant and Hooten to the police department and how he spoke with them each individually. He explained that he provided the Defendant with his Miranda rights, had a conversation with the Defendant, and then asked the Defendant to provide a written statement summarizing their conversation. The Defendant said that he could not spell very well, and Officer Patin wrote down what the Defendant told him and then went over this statement with the Defendant. Officer Patin testified that the Defendant admitted that he went into Moore's trailer and took a fish, chicken, and a walkman out of the apartment and that he took the compromise joint bars from CSX property. Officer Patin read the following Defendant's written statement to the jury:

> Michelle picked me up at my sister's house this morning about 7:30 a.m. We went and paid her bill at the bank, then [w]e went to my mother's house on Park Street. We called around to try and find us a place to live. We left and rode around a little while. Then I told Michelle to pull into the railroad place. I got out and loaded up the railroad tie joint bars. I got about twenty of them.
>
> Then we went to Cornersville to Cam Harmon's junk yard and sold them for

$53.10. Then we went back to my mother's house - - went back to my mother's and while my mother was calling to try to find us a place, me and Michelle went riding around again to try to look for a place to live. That is when we seen a "For Rent" sign at a trailer on 4th Avenue.

The door was open so we went in and looked around. A lady that lives in one of the trailers said go in and look around.

That is when I looked in the refrigerator and found some chicken that looked like it was bad.

So I took it to feed my sister's dog. Then we found some fish things on the floor so we took them, and an earphone set was on the patio.

I told Michelle to put them in her pants and she did.

Then [we] went back to my mother's. My mother told us that Sue Allen had an apartment so we went and looked at the apartment and Michelle filled out the paperwork and we paid her the money.

Then [we] went to get my mother to show the apartment to her.

Then we took mother back to her house. That is when the police got us. We were homeless living in a storage building with no way to eat or bathe. I am sorry. We just don't have any money. I just want someone to help us. Signed Joel Jones.

Detective Patin testified that he read Hooten her rights and then had a conversation with her. Patin read the following statement that Hooten wrote to the jury:

After I pulled up Joel at Wendy's, drove - - we went to - - looks like Iris's mom's. Then we went to the credit union.

We went to CSX and got some metal and sold it in Cornersville. We went to the trailer because it was for rent and went in and got a couple of things.

We went to the storage building for a while. I paid a deposit on an apartment and then we went back to Joel's mom's house.

We took from the trailer a portable stereo, two singing fish and some chicken. Signed Michelle Hooten.

On cross-examination, Detective Patin acknowledged that he may have had trouble reading some of Hooten's handwritten words and that she may have actually written that, "We went to CSX

-5-

and got scrap metal" instead of "we went to CSX and got some metal." He acknowledged that the Defendant and Hooten never changed their stories that they went to the trailer in order to look at it as a possible place to rent. He admitted that the Defendant may have mentioned something about the trailer's lack of electricity. He acknowledged that the Defendant had informed him that, when he opened the refrigerator, one of the bags of chicken smelled rotten. He did not recall if the Defendant told him that there was garbage on the trailer's patio porch. He did not recall the Defendant telling him that the home lacked curtains or furniture. He admitted that the Defendant may have told him that the Defendant thought the material he had obtained from CSX property was scrap metal.

On redirect, Patin testified that both the Defendant and Hooten admitted that they took Moore's property once they were inside his trailer. He further testified that they both reported that Hooten hid something underneath her clothes.

The Defendant testified that he was homeless and that he kept his personal belongings in a storage building. He said that, on the day of the crime, Hooten picked him up and they drove around picking up scrap. He explained that he has been collecting scrap his entire life and that he sells the scrap material that he collects to Harmon's junkyard. He said that he and Hooten passed a railroad track, and he saw a sign that said "scrap." He told Hooten about the sign, they pulled over, and the Defendant collected a few joint bars. He explained that he saw a lot of buckets and piles of plastic, and he thought that these materials were trash. He said that, after he collected a few joint bars, he went to Harmon's junkyard and sold him the joint bars, and then cashed the check at the credit union that Wooten uses.

He testified that he and Hooten then looked for a place to live. He explained that he and Hooten had looked at Pat Smith's properties, and they saw a "For Rent" sign with the phone number for Pat Smith's properties in front of the trailer. He said that Ms. Moore came out of the trailer, explained that the trailer was for rent, and gave the Defendant and Hooten permission to go inside the trailer. He explained that he knew Ms. Moore because he knew her son, Randy Moore, and that he thought that he could enter the trailer because its door was wide open. He testified that, once inside, he opened the refrigerator, and found a package of ruined chicken, which he took. He testified that the trailer did not have any furniture inside, except for a kitchen table, and did not have working electricity or running water. He said that he stayed inside the trailer for about four to five minutes. He testified that he took a garbage bag full of items from the trailer's front patio to his mother's house and that he went through the items inside the garbage bag. He said that the fish and the walkman were inside the garbage bag that he found on the patio. He explained that he thought the chicken and the headphones were trash. He further testified that he had intended to contact Pat Smith in order to rent the trailer, but, when he got to his mother's home, he learned that his mother had found another place for them to live.

The Defendant testified that, when he took the materials from CSX property, he did not realize that he could be charged with stealing. He said that he understood that he had done something wrong after discussing the incident with Detective Patin, but he did not intend to do

something wrong. He agreed that the chicken and the fish were in the back of his pick-up truck and that he was not trying to hide these items. He also said that the walkman was lying in the front of his pick-up truck and that he was not trying to hide the walkman. The Defendant did not recall that a CSX employee had driven up close to the Defendant's truck while the Defendant was picking up the joint bars on CSX property.

On cross-examination, the Defendant agreed that he told the jury that the two fish and the walkman were in a garbage bag that he took from the trailer. He testified that, when he encountered the police, the two fish were inside a white bucket and were not inside the garbage bag. The following portion was read from the Defendant's statement "I took it to feed my sister's dog. Then we found some fish things on the floor so we took them, and an earphone set was on the patio." When asked if that was what the Defendant said, the Defendant replied that he said those words because he was intimidated. He testified that Wooten did not stick the radio in her pants, but he admitted that he told Detective Patin that she stuck the radio in her pants. The Defendant said that he knew that the CSX property did not belong to him, but that he did not steal the materials because he thought they were scrap. He acknowledged that no one gave him permission to take the property that did not belong to him.

Joyce Moore testified that she knew the Defendant through her son, Randy. She said that, on the day of the crime, she did not see the Defendant, and she did not give him permission to enter the trailer. She said that, when she was inside Moore's trailer, she had seen a fish on a plaque lying on the kitchen table.

### III. Analysis
### A. Sufficiency of the Evidence

The Defendant contends that the evidence is insufficient to support his convictions for aggravated burglary and for theft of property valued at more than $1000. When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); State v. Goodwin, 143 S.W.3d 771, 775 (Tenn. 2004) (citing State v. Reid, 91 S.W.3d 247, 276 (Tenn. 2002)). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. State v. Pendergrass,13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999).

In determining the sufficiency of the evidence, this Court should not re-weigh or re-evaluate the evidence. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. State v. Buggs, 995 S.W.2d 102, 105 (Tenn. 1999); Liakas v. State, 286 S.W.2d 856, 859 (Tenn. 1956). Questions concerning the credibility of the witnesses, the weight and value of the evidence, and all factual issues raised by the evidence are resolved by the trier of fact. Liakas, 286 S.W.2d at 859. "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State

and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 405 S.W.2d 768, 771 (1966) (citing Caroll v. State, 370 S.W.2d 523, 527 (Tenn. 1963)). This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. Goodwin, 143 S.W.3d at 775 (citing State v. Smith, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. Id.; see State v. Carruthers, 35 S.W.3d 516, 557-58 (Tenn. 2000). However, before an accused can be convicted of a criminal offense based on circumstantial evidence alone, the facts and circumstances "'must be so strong and cogent as to exclude every other reasonable hypothesis save the guilt of the defendant . . . .'" Goodwin, 143 S.W.3d at 775. "In other words, a web of guilt must be woven around the defendant from which he cannot escape and from which facts and circumstances the jury could draw no other reasonable inference save the guilt of the defendant beyond a reasonable doubt." Id. We note that it is well-established law in Tennessee that the testimony of a victim, standing alone, is sufficient to support a conviction. State v. Strickland, 885 S.W.2d 85, 87 (Tenn. Crim. App. 1993); State v. Williams, 623 S.W.2d 118, 120 (Tenn. Crim. App. 1981).

### 1. Aggravated Burglary

The Defendant contends that the evidence is insufficient to sustain his conviction for aggravated burglary. Specifically, the Defendant argues that the State failed to prove beyond a reasonable doubt that he entered Terry Moore's trailer with the intent to commit a theft. The State contends that the evidence is sufficient to support the Defendant's conviction.

Aggravated burglary occurs when, without the effective consent of the property owner, a person enters a habitation with intent to commit a felony, theft, or assault. Tenn. Code Ann. § 39-14-403 (2003). "A person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." Id. § 39-14-103 (2003). Importantly, we note here that "unsatisfactorily explained possession of recently stolen property may be sufficient in and of itself to establish a burglary." State v. Jones, 901 S.W.2d 393, 396 (Tenn. Crim. App. 1995).

We conclude that sufficient evidence was presented for a rational jury to find the Defendant

guilty of aggravated burglary. In the statement that the Defendant gave to Officer Patin, he acknowledged that he took fish, chicken, and a walkman from Terry Moore's trailer and that he asked Hooten to hide the walkman in her pants. Primm testified that he saw the Defendant and Hooten enter Terry Moore's trailer and take his possessions. Further, the Defendant was found in possession of the two fish, the chicken, and the walkman, all of which were recently stolen. The Defendant claims that he entered the trailer to determine if he wanted to rent the premises and that Ms. Moore gave him permission to enter Terry Moore's trailer, but Ms. Moore testified that she never even saw the Defendant on the day of the crime. The jury was entitled to accredit the testimony of Ms. Moore. The jury, as they were entitled to, chose not to believe the Defendant's version of the incident. Given the conflicting testimony between the Defendant and Ms. Moore about whether the Defendant had permission to enter the trailer, Terry Moore's testimony that he locked the door of his trailer, and the Defendant's own sworn statement that he asked Hooten to hide the walkman in her pants, the jury could properly infer that the Defendant planned to commit a theft of Terry Moore's trailer when he entered the premises. The evidence established at trial was sufficient to support the verdict of the jury. The Defendant is not entitled to relief on this issue.

## 2. Theft

The Defendant contends that the evidence is insufficient to support his conviction for theft of property valued at more than $1000. Specifically, the Defendant contends that the State failed to prove beyond a reasonable doubt that the Defendant took CSX Transportation's property knowing that he did not have consent to do so. The State contends that the evidence is sufficient to support the Defendant's conviction.

Pursuant to Tennessee Code Annotated section 39-14-103, "A person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." Id. § 39-14-103. The evidence, viewed in the light most favorable to the State, established that the Defendant took eight to ten pairs of compromise joint bars costing $142.25 each from CSX property, for a total value of approximately $1138.00 to $1422.00. In the Defendant's sworn statement, he explained that he took about twenty railroad joint bars from CSX property and sold them to Harmon. The Defendant contends that he saw a sign reading "scrap" near the materials that he took and believed that the sign provided effective consent by CSX Transportation for any person to take the property. The State's evidence, however, amply refutes the Defendant's theory. Mitchell testified that the compromise joint bars were kept stacked in a pile separate from the buckets and pile of plastic trash on CSX property. Mitchell also testified that, when he saw the Defendant, the Defendant appeared to be in a hurry to get into the pick-up truck, and the Defendant's truck "took off" and left the premises after Mitchell peered into the bed of the truck and saw the joint bars that the Defendant took from CSX property. Additionally, Emerson testified that the CSX compromise joint bars that he saw at Harmon's junk yard were made from new material and did not look like "scrap." Considering the Defendant's admission that he took the materials, the testimony of Mitchell that the Defendant's truck sped away when Mitchell approached, and Emerson's testimony that the materials did not appear to be scrap, the evidence is sufficient to sustain the Defendant's conviction for theft of

property. Further, the testimony of Malhorta established that the value of the stolen material exceeded $1000.00. The Defendant is not entitled to relief on this issue.

## B. McCool's Testimony

In his brief, the Defendant asserts that Pamela McCool would have testified that the Defendant and Hooten came to her home on Park Avenue and said that they had found a trailer to rent. At trial, the Defendant attempted to call McCool as a witness, and the State objected to her testifying because she claimed that she had been inside the courtroom during the trial. The State questioned McCool about her presence in the courtroom. McCool stated that she had been outside the courtroom all day and that she did not hear any of the testimony that was presented to the court. The trial court judge found that McCool had been inside the courtroom during the trial and that she had "slipped in twice. . . . [and] took her child out at different times."

The Defendant contends that the trial court abused its discretion when it disqualified McCool as a witness. Specifically, the Defendant contends that McCool's testimony was crucial to his defense because it would have proved that the Defendant lacked the requisite intent in the aggravated burglary charge. The Defendant further contends that, if McCool heard any testimony, such actions were inadvertent and unintentional, and her conduct caused no harm or prejudice to the State. The State contends that McCool's conduct warranted the trial court's decision to disqualify her as a witness.

Tennessee Rule of Evidence 615 provides: "At the request of a party the court shall order witnesses, including rebuttal witnesses, excluded at trial or other adjudicatory hearing." Our Supreme Court has ruled that "[t]he purpose of the rule is to prevent one witness from hearing the testimony of another and adjusting his testimony accordingly." State v. Harris, 839 S.W.2d 54, 68 (Tenn. 1992). "'The rule' may be invoked at anytime and is mandatory." State v. Anthony, 836 S.W.2d 600, 605 (Tenn . Crim. App. 1992). Despite the fact that the rule is mandatory, there is no established sanction for its violation. Rather, trial judges are "afforded wide discretion" in their determination of how to best handle a violation of the rule. State v. Coulter, 67 S.W.3d 3, 52 (Tenn. Crim. App. 2001). "The trial judge has broad discretion in the decision regarding the exclusion of witnesses in accordance with the rule, and unless this discretion is abused his action will not be reversed." State v. Wicks, 729 S.W.2d 283, 286 (Tenn. Crim. App. 1987).

Although the Defendant contends that Ms. McCool's testimony would have proven that he lacked the requisite intent to commit aggravated burglary, the record does not contain this information because the Defendant did not make an offer of proof describing the expected contents of McCool's testimony.[1] Tenn. R. Evid. 103. Since the record does not contain any information regarding the expected testimony, we cannot determine whether the disqualification of this witness constitutes reversible error. However, we doubt that the trial court's refusal to let McCool testify

---

[1]The Defendant made offers of proof that consisted of two witnesses testifying about whether McCool was present in the courtroom during trial.

was prejudicial in light of other overwhelming evidence of the Defendant's guilt, including the testimony of Primm and the statements that the Defendant and Hooten gave to the police. Reversal is required only if the error affirmatively appears to have affected the result of the trial on the merits, or, in other words, reversal is required only if the error more probably than not affected the judgement to the Defendant's prejudice. See Tenn. R. Crim. P. 52(a); Tenn. R. App. P. 36(b). In the case under submission, the evidence was strong against the Defendant. If there was error in exclusion of the testimony of the witness, it was no more than harmless error.

### C. Length of Trial

The Defendant contends that the trial court erred when it extended the trial into late evening hours. Specifically, the Defendant contends that his right to a fair trial was compromised because the jury was fatigued. The State contends that the Defendant waived this complaint because he failed to object at trial and failed to raise this issue in his motion for new trial. We note that the Defendant failed to object at trial, and he did not raise this issue in his motion for new trial. Therefore, he has risked waiving this issue. Tenn. R. App. P. 36(a); Tenn. R. App. P. 3. We will, however, address this issue on its merits.

In Hembree v. State, 546 S.W.2d 235 (Tenn. Crim App. 1976), this Court laid down the rule regarding night trial sessions. Id. at 242; see also State v. McMullin, 801 S.W.2d 826, 827-32 (Tenn. Crim. App. 1990). In Hembree the defense counsel stated that they were tired, they were not thinking clearly, and they could not effectively assist their clients. Id. at 242. Counsel asked the court to adjourn until the next day, and the trial court refused this request. Id. This Court held that the trial court erred in not adjourning at midnight and stated:

> We are also mindful of the fatigue of the jurors. We think that absent unusual and compelling circumstances, the jury should not be permitted to listen to evidence until 1:00 a.m. No reasonable cause was given for proceeding until this hour and a defendant being tried for murder is not only entitled to reasonably alert counsel, but to witnesses who are reasonably alert and that the jury should likewise be clear-headed and not unduly fatigued. We think that the 14th Amendment of the United States Constitution and Art. 1, § 8 of the Tennessee Constitution grants appellants these rights. This is not to say that night sessions per se are improper under unusual circumstances; however, we do hold that night sessions should be terminated at a more reasonable hour, absent consent of the parties and all members of the jury.

Id. at 242-43.

In State v. Craig, 655 S.W.2d 186 (Tenn. Crim. App. 1983), this Court found that the defendant's right to a fair trial was not violated by the trial court's denial of his motion for adjournment despite his allegations of jury fatigue caused by the trial's extended hours. Id. at 191. Like the case under submission, the defendant in Craig did not argue that he received ineffective counsel due to the trial's extended hours. Id. In Craig, this Court noted that short recesses, in

-11-

addition to lunch and dinner breaks, were taken during the trial and that no member of the jury requested an adjournment. Id. This Court in Craig further noted that the record lacked any indication of jury fatigue and concluded that, "The jury was obviously fully capable of considering the evidence. We find nothing in the record to indicate that the jury's verdict was in any way affected or influenced by the night session of which complaint is made." Id.

In the case under submission, a juror explained that he could not meet the next day due to prior obligations. After informing the jury that the presentation of the evidence and the jury instructions would probably not be given until midnight, the trial court polled the jury by questioning each member about whether he or she felt that he or she could concentrate and finish the case that night. The jurors all responded that they could concentrate and finish the case that night. The record indicates that the jury took several hours to reach a verdict. Jury deliberations began at 11:20 p.m. and the jury returned a verdict at 3:35 a.m. Therefore, the record does not reflect that the jury rushed deliberations due to fatigue. Like the trial discussed in Craig, there was no juror complaint or any evidence of juror fatigue during the trial of this case, and the deliberations began approximately forty minutes prior to the time to which all of the jurors had consented. This case is distinguishable from Hembree because the Defendant does not claim that counsel was ineffective due to the trial's extended hours, the Defense counsel made no motions to recess at normal hours, the trial court obtained permission from the jurors to work for extended hours, and the trial was extended at the request of one of the jurors. We find that the extended hours involved in this particular trial, which were prolonged to accommodate the needs of a juror, without protest of Defendant's counsel and with the express agreement of the jurors, does not violate the rule laid down in Hembree v. State. The Defendant is not entitled to relief on this issue.

### III. Conclusion

In accordance with the foregoing authorities and reasoning, we affirm the judgments of the trial court.

_____
ROBERT W. WEDEMEYER, JUDGE